UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 08-B-73908 |
| | ) | |
| Modern Metal Products Co., | ) | Adversary No. 09-A-96243 |
| Debtor. | ) | |
| Modern Metal Products Co., | ) | Chapter 7 |
| Plaintiff, | ) | |
| v. | ) | Judge Lynch |
| | ) | |
| Virtual Engineering, Inc., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on an Adversary Complaint, originally filed by the Debtor while the case was pending under Chapter 11 and adopted by the Chapter 7 Trustee after the case was converted to Chapter 7.[1] The Trustee seeks to avoid and recover a transfer to Virtual Engineering Inc. as a preferential transfer under 11 U.S.C. §§ 547 and 550. He further seeks to disallow Virtual Engineering's proof of claim pursuant to 11 U.S.C. § 502(d) unless and until the preference is repaid to the estate. For the reasons set forth herein, the court finds that Virtual Engineering has asserted valid defenses to the action. Accordingly, judgment will be entered in favor of the Defendant.

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance

---

[1] The case was initially filed as a voluntary petition under Chapter 11 on Bankruptcy Code on December 1, 2008. The Debtor initially operated as a debtor in possession, but between January 2009 and October 2009 sold substantially all of its assets. On December 30, 2009, the court granted the Debtor's voluntary motion to convert to Chapter 7.

Page 1 of 12

of claims), (C) (counterclaims by the estate) and (F) (proceedings to determine, avoid, or recover preferences). As an action to avoid a preferential transfer against a creditor who filed a proof of claim against the estate – a claim the Trustee has objected to on the basis of the purported preferential transfer – the matter is within this court's constitutional authority to enter final judgments. *Katchen v. Landry*, 382 U.S. 323, 335 (1966) (bankruptcy courts have "summary jurisdiction to compel a claimant to surrender preferences that [the statutory predecessor to 11 U.S.C. §502(d)] would require disallowance of the claim"). Although the Supreme Court indicated in *Stern v. Marshall* that a *state law* counterclaim against a claimant that *is unrelated* to the claimant's claim against the estate might not be within a bankruptcy court's constitutional authority to enter final judgment, the Court merely distinguished its earlier ruling in *Katchen* by noting that there "the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law" and "it was not possible for the referee to rule on the creditor's proof of claim without first resolving the voidable preference issue." 131 S. Ct. 2594, 2616-18 (2011). The same is true here as in *Katchen* and, therefore, the matter is clearly within this court's constitutional authority. *See also Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 747 (7th Cir. 2013) ("The current dispute comes within a bankruptcy judge's authority, notwithstanding *Stern*, because all of the defendants submitted proofs of claim as the Funds' creditors and thus subjected themselves to preference-recovery and fraudulent-conveyance claims by the Trustee.").

## FINDINGS OF FACT[2]

The Debtor, Modern Metal Products Co., was a manufacturer of seat mechanisms and other automotive parts. The Defendant, Virtual Engineering, Inc., provided Modern Metal with

---

[2] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

Page 2 of 12

engineering services for product design and sales support services since 1993. Virtual Engineering generally issued invoices for engineering services monthly, charging $70 per hour, and those invoices stated that payment was due within 30 days of the invoice date. (Tr. 26: 10-14.) Despite the terms stated on the invoices, however, Virtual Engineering's president testified that Virtual Engineering had an informal agreement with Modern Metal to accept payment as late as 60 to 90 days after the invoice date. (Tr. 64:7-15.) He testified that in the automotive industry it was common to accept payments 50 to 60 days after invoice, and Virtual Engineering agreed to an extra 30 days beyond the industry standard. (Id.)

Between July 2007 and August 2008, Modern Metal did not pay a single engineering invoice from Virtual Engineering by the stated 30-day due date. (Ex. 18.) Instead, the invoices paid during that period were 17 to 75 days late, with an average date of payment, weighted by dollar amount, of 44.9 days late (74.9 days from date of invoice). For invoices paid during that period Virtual Engineering issued monthly batches of numerous invoices on the same day, approximately monthly. For approximately two-thirds of the monthly batches of invoices, Modern Metal paid the entire batch in a single payment. For the others, Modern Metal paid several of the invoices in a batch in one payment and the remainder of the invoices in the batch in an additional one or two payments, always paying older invoices before newer invoices and never paying invoices from different batches on the same day. Payments were made sometimes a month to a month and a half apart, and sometimes only a few days or weeks apart. Payments ranged in size from $5,390 to $86,930, with an average payment of $31,197.68.

During that period, Modern Metal did not pay any monthly batch of invoices in full less than 30 days late, and only paid 3 of 14 monthly batches in full less than 40 days late. There is no easily discernable trend or pattern for the lateness in payments, either by season or based on

amount. The May 2008 invoices, totaling $63,775, were paid 61 days late. The June 2007 invoices, totaling $86,930, were paid 56 days late. $52,390 of the May 2007 invoices were paid 75 days late, and $5,740 of the October 2007 invoices were paid 74 days late.

On November 4, 2008, Modern Metal paid Virtual Engineering $50,965 by wire transfer to pay 21 separate invoices for engineering services. Each of these invoices was dated August 14, 2008 and each bore the invoice due date of September 13, 2008 (52 days late). (Pretrial Order, ECF No. 68, Adversary Complaint, ECF No. 1, Answer to Complaint, ECF No. 6.) Usually, Modern Metal had paid Virtual Engineering by check, sometimes sent by overnight mail, but this was not the only time the company had paid Virtual Engineering by wire transfer. (Tr. 66: 1-11, 70:24 – 71:8.) Virtual Engineering's president testified that he sent a single e-mail at the end of October 2008 to David Ewing at Modern Metal asking when Virtual Engineering would be paid for the August 2008 invoices. But he also testified that he did not demand payment and that it was not unusual for him to send that type of e-mail to Mr. Ewing. (Tr. 65:8-17, 70:10-12.) The e-mail indicated that Virtual Engineering would accept payment by wire transfer, but did not demand that payment be made through that method. (Tr. 70:17-23.) Virtual Engineering's president knew as early as September 2008 that Modern Metal might be planning to file bankruptcy at some point in the future. He knew this because Modern Metal had rejected an offer by Virtual Engineering to buy Modern Metal, indicating that the company "felt that they could get more money out of going to a bankruptcy." (Tr. 69:15-24, 72:1-15, 32:10-17.)

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on December 1, 2008. The parties stipulate that Virtual Engineering provided new value to the Debtor subsequent to the transfer but before the bankruptcy petition in the amount of $38,850.00 for which Virtual Engineering has not been paid. (Pretrial Order, ECF No. 68.)

## DISCUSSION

The parties have stipulated that the full payment of $50,965 by wire transfer on November 4, 2008 from the Debtor to Virtual Engineering was a transfer of an interest of the Debtor in property to Virtual Engineering on account of an antecedent debt owed by the Debtor to Virtual Engineering made while the Debtor was insolvent, made on or within 90 days before the petition date and which enabled Virtual Engineering to receive more than it would have received in a case under Chapter 7 of the Bankruptcy Code if the transfer had not been made. (Pretrial Order, ECF No. 68.) Virtual Engineering therefore concedes that the payment constituted a preferential transfer under Section 547(b). The parties have also stipulated that Virtual Engineering provided new value to the Debtor subsequent to the transfer in the amount of $38,850.00 which is not secured by an otherwise unavoidable security interest and on account of which the Debtor did not make an otherwise unavoidable transfer to or for the benefit of Virtual Engineering. (Id.) The Trustee therefore concedes that $38,850 of the transfer is unavoidable under the "new value defense" under Section 547(c)(4). All that remains at issue is the $12,115 portion of the transfer. Virtual Engineering asserts the "ordinary course defense" under Section 547(c)(2) for that amount, which the Trustee contests.

*(a) The Ordinary Course Defense*

Section 547(c)(2) provides that a trustee may not avoid an otherwise avoidable preferential transfer:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>     (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>     (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). Virtual Engineering bears the burden of proving that the exception to avoidability applies by the preponderance of the evidence. *In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir. 1995); 11 U.S.C. §547(g).

Prior to 2005, a creditor needed to demonstrate *both* that the transfer was made in the "subjective" ordinary course between the actual parties and in the "objective" ordinary business terms of the relevant industry as a whole. *See, e.g., In re Midway Airlines, Inc.*, 69 F.3d 792, 797-98 (7th Cir. 1995). The 2005 amendments to the Bankruptcy Code changed this so that these two elements are now presented in the alternative. In either case, however, the creditor must still demonstrate that the original debt was incurred in the ordinary course of business or financial affairs of both the debtor and the transferee. The amendment was primarily in response to the perceived difficulty of demonstrating that a payment was made according to ordinary business terms. *See Cox v. Momar Inc. (In re Affiliated Foods Southwest Inc.)*, 750 F.3d 714, 717 (8th Cir. 2014) ("Quite often industry standards are extremely difficult to ascertain outside bankruptcy and difficult to prove in the context of preference litigation. Thus, it is more accurate to rely on the relationship between the parties."). Here, Virtual Engineering apparently does not dispute that the payment was not "made according to ordinary business terms."[3] Virtual Engineering's president, Stephen Kennel, acknowledged that he understood that "in the automotive industry it is very normal for Modern to be paid anywhere from 50 to 60 days" but that Virtual Engineering allowed Modern Metal to pay as much as 30 days beyond the industry standard. (Tr. 64: 7-22.)

    *(i)    It is Undisputed that the Debt Was Incurred in the Ordinary Course.*

Although little detail was provided, Virtual Engineering's president testified without

---

[3] The term "ordinary business terms" refers to "the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope" of the term. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

contradiction that each of the invoices at issue were for engineering services provided by Virtual Engineering, and such testimony is supported by the copies of the invoices. (Tr. 64:1-6, Ex. 6.) There appears to be no dispute that the work described in the invoices was actually done. Nor is there a dispute as to the fees charged. Mr. Kennel testified that Modern Metal had agreed to pay $70.00 per hour for engineering work and that Virtual generally sent invoices on a monthly basis, with an "official" stated due date of 30 days after invoice. (Tr. 26:10-14, 64: 7-15.) Mr. Kennel also testified that Virtual Engineering did "all of [Modern Metal's] product design work" since 1993 pursuant to an "engineering sales contract" entered into between Virtual Engineering and Modern Metal that year. (Tr. 8:22-9:5.) There is no dispute that the engineering work performed related to Modern Metal's ordinary business as a producer of seating mechanisms for automobiles. Accordingly, the court finds that the debt paid by the contested transfer was in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Virtual Engineering.

> *(ii)    Virtual Engineering Demonstrated that the Payment Was Made in the Ordinary Course of Business or Financial Affairs of the Debtor and Virtual Engineering.*

In determining whether a payment is made within the ordinary course of business between the two parties, courts have considered factors including: "(1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003) (quoting *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir. 1997)). This list of factors is not exhaustive and other factors "in appropriate considerations, may be a better fit." 334 F.3d at 642. The ordinary business defense is intended "to encourage normal credit transactions and the

continuation of short-term credit dealings with troubled debtors so as to postpone, rather than hasten, bankruptcy to the extent that this result does not detract from the policy of the preference section of discouraging unusual action by either the debtor or its creditors during the debtor's slide into bankruptcy." *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1297 (11th Cir. 2009). The exception "was designed to leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee." *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003) (internal quotation marks and citation omitted). In contrast, a "sudden payment in full of all debts in a discrete category, in anticipation of bankruptcy and for the purpose of helping a favored class of creditors, is the paradigm of a preference." *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1121 (7th Cir. 1998) (quoting *In re Milwaukee Cheese Wisc., Inc.*, 112 F.3d 845, 847 (7th Cir. 1997)).

Although other factors are relevant, unless "late payments are first shown to be ordinary on the basis of their timing or 'lateness,' the defense will fail and it will be unnecessary to consider other facts." *Covey v. Nash Crane Serv., Inc. (In re Pierce Dev. Corp.)*, 450 B.R. 844, 847 (Bankr. C.D. Ill. 2011). But, a payment past a stated due date may, in certain instances, still be in the ordinary course of business between the two parties. First, a history of accepting late payments may create a course of dealing that modifies the contract terms. As noted by the Seventh Circuit Court of Appeals in *Tolona Pizza*, "a 'late' payment really isn't late if the parties have established a practice that deviates from the strict terms of their written contract." 3 F.3d at 1032. Here, at least for the sixteen months before the petition date, it appears that Modern Metal never paid by the stated 30-day due date or even 17 days thereafter, yet Virtual Engineering

accepted all those payments. Second, even where a history of forbearance is not sufficient under contract law to modify the terms of the contract, such history may be enough to make late payments within the "ordinary course of business" for purposes of Section 547(c)(2). *See In re Xonics Imaging Inc.*, 837 F.2d 763, 766 (7th Cir. 1988) ("[W]e do not see why in such a case the parties' 'ordinary course of business' should be defined by their contract rather than by their practice.").

At issue in *Tolona Pizza* were payments made between 12 and 32 days after invoice and averaging 22 days during the preference period on invoices that stated that payment was due within seven days. During the 34 months preceding the preference period in that case, the average period invoices to the debtor were outstanding was 26 days with the longest time 46 days. 3 F.3d at 1031-32. In reaching its decision as to whether the payments were according to ordinary business terms, the court noted that for payments to be found to be within the ordinary course between the parties the question was whether payments "conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period."[4] 3 F.3d at 1032. Other courts have held that to determine whether a late payment is in the ordinary course of business the court should compare "the average time it took the debtor to pay an invoice during the baseline period" before the debtor began experiencing financial difficulties to "the time it took to pay invoices in the preference period." *Unsecured Creditors Comm. v. Jason's Food, Inc. (In re Sparrer Sausage Co. Inc.*, No. 12-B-04289, 13-A-01195, 2014 WL 4238103 (Bankr. N.D. Ill. Aug. 27, 2014) (finding that eleven payments outside the 16 to 28 day range of payments during the baseline historical period were not subject to the ordinary course defense). Some courts have even suggested that payments made slightly outside the

---

[4] In *Tolona Pizza*, a pre-2005 amendment case, the parties agreed that the payments were within the ordinary course between the parties.

baseline may still be considered to be in the ordinary course. *See, e.g., H.L. Hansen Lumber Co. of Galesburg, Inc. v. G & H Custom Craft, Inc. (In re H.L. Hansen Lumber Co. of Galesburg, Inc.)*, 270 B.R. 273, 279 (Bankr. C.D. Ill. 2001) (expanding outer limit of baseline range by 10%).

Here, the contested payment, although slightly later than average, falls well within the historical baseline range. Approximately three months before, Virtual Engineering had accepted a slightly larger payment nine days later. The previous year, Virtual Engineering had accepted a much larger payment four days later and a similar sized payment over twenty days later than the contested payment. Nor, based on the timing of other late payments, does it appear that the payment at issue was spurred by concern about Modern Metal's financial condition or an attempt to prefer and appease Virtual Engineering at the expense of other creditors.

The Trustee argues that the payments were not ordinary course because: (1) they were made by wire transfer instead of check, (2) Virtual Engineering sent an e-mail to Modern Metal inquiring about payment, and (3) Virtual Engineering knew at the time of the transfer that Modern Metal was contemplating bankruptcy. While these are factors to be considered under *Kleven*, Virtual Engineering has still demonstrated that the payment was made in the ordinary course. First, while check had been the usual form of tender in the past, Virtual Engineering's president testified without contradiction that Modern Metal had paid by wire transfer one or more times in the past. *See, e.g., Brown Transp. Corp. v. BP Exploration & Oil, Inc. (In re Brown Transp. Truckload, Inc.)*, 161 B.R. 735, 740 (Bankr. N.D. Ga. 1993) (finding that "the mere fact the Defendant paid by wire transfer" rather than "corporate check as the parties had done in the past" did "not take this conduct outside the ordinary course of business"). He also testified that Virtual Engineering had not demanded or required payment by wire transfer. The

transfer did not take place, for example, immediately before Modern Metal filed its petition. There is no indication that payment by wire transfer rather than check was intended to convey any benefit upon Virtual Engineering. *Cf. Central Hardware Co. v. Walker-Williams Lumber Co. (In re Spirit Holding Co., Inc.)*, 214 B.R. 891, 897-98 (E.D. Mo. 1997) (wire transfer not ordinary course where debtor had never paid by wire transfer in the past, where change was made 4 days before petition and where creditor failed to present evidence that change was not in response to pressure by creditor). Second, while the e-mail to Mr. Ewing at Modern Metal could be seen as a collection activity, the evidence showed that it was not an *unusual* collection activity. Again, Virtual Engineering's president testified without contradiction that he had sent similar e-mails in the past. Also, it was only a single e-mail, was not styled as a demand and made no threats. As to the third point, while Virtual Engineering might have known that a bankruptcy filing was likely in the future, there is nothing to show that Virtual Engineering took advantage of the Debtor's deteriorating financial condition to obtain the payment. While Mr. Ewing mentioned bankruptcy as a possible option for Modern Metal when Modern Metal rejected Virtual Engineering's purchase offer several months before the petition, there is no proof to indicate that at the time Virtual Engineering received the November payment – a month before the bankruptcy commenced – Virtual Engineering knew for certain if or when Modern Metal would actually file its petition. Additionally, the payment history does not show that either Modern Metal's intent to file for bankruptcy or Virtual Engineering's possible knowledge of that intent affected the payment of invoices up to and including the November 2008 payment.

    Therefore, after weighing the evidence, the court finds that Virtual Engineering met its burden, proving by the preponderance of the evidence that the payment was made in the ordinary course of business.

## CONCLUSION

For the foregoing reasons, the court finds that the entire preferential transfer at issue is subject to valid affirmative defenses, and therefore judgment will be entered in the Defendant's favor. A separate order shall be entered giving effect to the determinations reached herein.

DATE: April 8, 2015        ENTER:        *[signature]*

Thomas M. Lynch
United States Bankruptcy Judge